The CITY OF KELLER, Appellant,

v.

John W. WILSON, Grace S. Wilson, Johnny L. Wilson, Nancy A. Wilson, Bursey Residential Limited, Texas Rover Realty, Inc., and Tri–West Enterprises, Inc., Appellees

and

John W. Wilson, Grace S. Wilson, Johnny L. Wilson, and Nancy A. Wilson, Appellants,

v.

Bursey Residential Limited, Bursey Joint Venture, Texas Rover Realty, Inc., and Tri–West Enterprises, Inc., Appellees.

No. 2–00–183–CV.

Court of Appeals of Texas, Fort Worth.

July 3, 2002.

Publication Ordered Oct. 31, 2002.

Rehearing Overruled Sept. 12, 2002.

Law, Snakard & Gambill, P.C., and Larry C. Bracken and Dabney D. Bassel, Fort Worth, Boyle & Lowry, L.L.P., and L. Stanton Lowry and Douglas H. Conner, III, Irving, for Keller.

David R. Casey, Hurst, for Wilson.

Barlow & Garsek, P.C., and J. Benjamin Barlow and James B. Barlow, Fort Worth, for Bursey and Texas Rover.

Bush & Morrison, P.C., and Robert L. Russell Bush and Carl J. Wilkerson, Arlington, for Tri–West.

PANEL A: CAYCE, C.J.;
LIVINGSTON and WALKER, JJ.

### OPINION

SUE WALKER, Justice.

### I. INTRODUCTION.

Several landowners sued the City of Keller ("City") for inverse condemnation and for water code violations. The landowners also sued upstream real estate developers for trespass and for water code violations. The trial court granted summary judgments in favor of the upstream developers. The landowners' claims against the City proceeded to trial, and a jury returned a verdict for the landowners. The trial court entered judgment on the jury verdict. The City appeals the judgment entered against it. The landowners also appeal, challenging the summary judgments granted for the developers. *See* TEX.R.APP. P. 25.1(c). We will affirm.

### II. PARTIES.

John W. Wilson and his wife Grace S. Wilson own contiguous tracts of land in the City. Johnny L. Wilson and his wife Nancy A. Wilson also own contiguous tracts of land, also in the City, adjacent to the tracts owned by John and Grace. These landowners were plaintiffs in the trial court and are collectively referred to herein as the "Wilsons." The tracts of land owned by the Wilsons are jointly referred to as the "Wilson property."

Bursey Residential Limited ("Bursey") planned and developed two residential subdivisions in the City: the Estates of Oak Run, Phases I and II. Texas Rover Realty, Incorporated ("Texas Rover") is the general partner in Bursey.[1] Tri–West Enterprises, Inc. ("Tri–West") planned and developed the residential subdivision Rancho Serena in the City. The Estates of Oak Run and Rancho Serena subdivisions are referred to herein either by name or as the "developments" or the "subdivisions."

### III. BACKGROUND FACTS.

The Wilson property is located southeast of the Oak Run and Rancho Serena subdi-

---

1. Bursey Joint Venture is a related entity not a party to this appeal.

visions. A piece of land owned by Z.T. Sebastian lies between the Wilson property and the subdivisions. Before the subdivisions were constructed, the land on which they are situated was undeveloped. The predevelopment natural flow of surface water was generally north to south across the undeveloped property, through a creek or branch on the Sebastian property, into a branch, creek or ditch on the Wilson property, and then into the Little Bear Creek Watershed.

In 1991, the City adopted a Master Drainage Plan ("Plan") for the area surrounding the Wilson property. Before the City allows any subdivision to be constructed, it requires the developer to provide for removal of run-off water resulting from a 100–year rain event. A developer's scheme to remove that run-off, though, cannot increase the flow or velocity of the water reaching downhill properties. The City approved Bursey and Texas Rover's development of Oak Run with the requirements that they construct a detention basin on the edge of the Estates of Oak Run and obtain and construct a permanent drainage easement, to be titled in the City's name, on the Sebastian property. Both the detention basin and the permanent drainage easement ("easement" or "Sebastian easement") were required by the City's Master Drainage Plan. The City approved Bursey's designs for the detention basin and the easement as complying with the Plan, and Bursey and Texas Rover built them.

Both subdivisions diverted water into the easement. Although the Plan showed the drainage easement extending across the Wilson property, the easement required by the City and built by the developers ended at the edge of the Wilson property, allowing the water to run freely out of the easement channel across the Wilson property. The construction of the easement resulted in increases in the volume and velocity of water flowing across the Wilson property, damaging the property.

## IV. PROCEDURAL HISTORY.

The jury returned findings favorable to the Wilsons on both their inverse condemnation special questions and their water code violation special questions. The Wilsons elected to recover on their inverse condemnation claim, and the trial court entered judgment for the Wilsons and against the City on that theory.

The trial court granted two summary judgments for Bursey and Texas Rover, disposing of both of the Wilsons' claims against them. The trial court granted summary judgment for Tri–West on the Wilsons' claims the day before trial.

## V. THE CITY'S APPEAL.

In seven issues on appeal, the City complains: that the Wilsons' failure to plead, and the judgment's failure to contain, a legal description of the property inversely condemned is fundamental error and renders the judgment void; that legally and factually insufficient evidence exists that the City acted "intentionally"; that the City should not be liable for damage caused by drainage facilities installed by a private developer; that the trial court erred by admitting a particular exhibit; and that the evidence is legally and factually insufficient to support the jury's finding that the City diverted the natural flow of surface water.

### A. The City's Appellate Issues Regarding Inverse Condemnation.

#### 1. Property Description.

In issues one and two, the City claims that the Wilsons' failure to include in the pleadings and judgment a legal de-

scription of the property inversely condemned deprived the trial court of jurisdiction over the suit and renders the judgment void. The Wilsons argue that no legal description of inversely condemned property is necessary and that, in any event, the City waived this contention by failing to specially except to the Wilsons' pleadings.

The City cites several cases in support of its contention that the Wilsons failure to plead a legal description of the condemned property deprived the trial court of jurisdiction. *See Miers v. Hous. Auth.*, 153 Tex. 236, 239, 266 S.W.2d 842, 844 (Tex. 1954); *Wooten v. State*, 142 Tex. 238, 240–41, 177 S.W.2d 56, 57 (Tex.1944); *Parker v. Fort Worth & D.C. Ry.*, 84 Tex. 333, 19 S.W. 518, 519 (1892); *Lin v. Houston Cmty. Coll. Sys.*, 948 S.W.2d 328, 332 (Tex. App.-Amarillo 1997, writ denied). These cases, however, involve condemnation actions brought by the State, not inverse condemnation claims. A governmental entity is clearly required to plead in its condemnation petition a description of the land it seeks to condemn. Tex. Prop.Code Ann. § 21.012 (Vernon 1984); *see also Duncan v. Calhoun*, 28 S.W.3d 707, 709 (Tex.App.-Corpus Christi 2000, pet. denied) (outlining procedure for condemnation action by condemning authority). Such a pleading is required so that the condemnee is on notice of what land the governmental entity is seeking. *State v. Nelson*, 160 Tex. 515, 518, 334 S.W.2d 788, 790 (1960); *Lin*, 948 S.W.2d at 332.

In an inverse condemnation proceeding, however, the alleged taking or damaging of property has already occurred. Our research has not revealed any support for the proposition that a landowner bringing suit for an inverse condemnation that has already occurred is required to plead a property description to vest the trial court with jurisdiction. We overrule the City's first issue.

■ The City argues that if it took the Wilson property for public use and must pay damages for that taking, then it is entitled to a transfer of title to the property. It is well-settled in Texas that the "government's duty to compensate for damaging property for public use ... [is] not dependent upon the transfer of property rights." *State v. Biggar*, 873 S.W.2d 11, 13 (Tex.1994) (holding compensable inverse condemnation occurred despite lack of transfer of property rights); *Steele v. City of Houston*, 603 S.W.2d 786, 791 (Tex. 1980) (same). The Wilsons are entitled to compensation for the damaging of their property for public use, notwithstanding their failure to transfer property rights to the City.

■ Next, the City contends that the judgment is void because it does not contain a description of the property inversely condemned. The City argues that "the failure of the Judgment ... to describe the properties taken is a fundamental error which directly and adversely affects the interest of the public generally." The City did not, however, seek title to the property in the trial court either directly or alternatively in its pleadings, in its motion for judgment notwithstanding the verdict, or in its objections to the Wilsons' proposed judgment. *Accord Stoner v. Thompson*, 578 S.W.2d 679, 683 (Tex.1979) (holding trial court cannot grant relief not supported by pleadings); *Holmstrom v. Lee*, 26 S.W.3d 526, 532 (Tex.App.-Austin 2000, no pet.) (same); *City of Fort Worth v. Gause*, 129 Tex. 25, 101 S.W.2d 221, 222 (1937) (holding default judgment awarding City "right and title" to two lots was "fundamentally erroneous" because "the [C]ity's answer did not contain a cross-action ... to try the title to the lots."); *see also Tex. W.R. Co. v. Cave*, 80 Tex. 137, 15

S.W. 786, 786 (1891) (vesting title in railroad because it filed a cross-action for condemnation in plaintiff's inverse condemnation claim).

Nor was the issue of transferring to the City title to the Wilson property that was damaged or taken tried by consent. *See* TEX.R. CIV. P. 67. Trial by consent is intended to cover the exceptional case where it clearly appears from the record as a whole that the parties tried the unpleaded issue. *Stephanz v. Laird,* 846 S.W.2d 895, 901 (Tex.App.-Houston [1st Dist.] 1993, writ denied). It is not intended to establish a general rule of practice and should be applied with care, and never in a doubtful situation. *Id.* Here, the City, although conceding that its Plan required it to condemn approximately 2.8 acres of the Wilson property, did not offer into evidence a legal description of the tract to be condemned under the Plan, or seek title to that tract. Instead, throughout trial, the City asserted that condemnation of the Plan's proposed easement across the Wilson property was unnecessary because the portion of the Plan implemented—the detention basin and the Sebastian easement—would not increase the volume or velocity of water flowing across the Wilson property. Thus, we cannot hold that the judgment's failure to include relief never sought by the City renders it void. We overrule the City's second issue.

### 2. The City's Intent.

In its third and fourth issues, the City argues that the evidence is both legally and factually insufficient to support a finding that the City "acted intentionally in allegedly" inversely condemning the Wilson property. When both legal and factual sufficiency challenges are presented, we consider legal sufficiency grounds before factual sufficiency ones. *Glover v. Tex. Gen. Indem. Co.,* 619 S.W.2d 400, 401 (Tex. 1981). In determining a legal sufficiency

or "no-evidence" issue, we are to consider only the evidence and inferences that tend to support the finding and disregard all evidence and inferences to the contrary. *Cont'l Coffee Prods. Co. v. Cazarez,* 937 S.W.2d 444, 450 (Tex.1996); *Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 499 (Tex.1995); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951). If there is more than a scintilla of such evidence to support the finding, the claim is sufficient as a matter of law. *Cazarez,* 937 S.W.2d at 450; *Leitch v. Hornsby,* 935 S.W.2d 114, 118 (Tex.1996). A "no-evidence" issue may only be sustained when the record discloses one of the following: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla of evidence; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez,* 977 S.W.2d 328, 334 (Tex.1998), *cert. denied,* 526 U.S. 1040, 119 S.Ct. 1336, 143 L.Ed.2d 500 (1999) (citing Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 TEX. L.REV. 361, 362–63 (1960)). There is some evidence when the proof supplies a reasonable basis on which reasonable minds may reach different conclusions about the existence of the vital fact. *Orozco v. Sander,* 824 S.W.2d 555, 556 (Tex.1992).

A landowner may bring an inverse condemnation claim pursuant to article I, section 17 of the Texas Constitution when his property is taken, damaged, or destroyed for, or applied to, public use without adequate compensation. *See* TEX. CONST. art. I, § 17. The elements of a constitutional inverse condemnation claim are: (1) the State intentionally performed certain acts in the exercise of its lawful

authority; (2) that resulted in a "taking" of property; (3) for public use. *State v. Hale*, 136 Tex. 29, 146 S.W.2d 731, 736 (1941); *Kerr v. Tex. Dep't of Transp.*, 45 S.W.3d 248, 250 (Tex.App.-Houston [1st Dist.] 2001, no pet.); *Bennett v. Tarrant County Water Control Imp. Dist. No. One*, 894 S.W.2d 441, 448 (Tex.App.-Fort Worth 1995, writ denied); *Kite v. City of Westworth Village*, 853 S.W.2d 200, 201–02 (Tex.App.-Fort Worth 1993, writ denied).

The City's legal and factual sufficiency challenges address the intent element of the Wilsons' inverse condemnation claim. The City claims that it never intended to damage the Wilson property and that it "endeavored in every way possible to avoid increasing the flow of water" onto the Wilson property, pointing out that it hired an independent engineering firm to review the developer's permanent drainage easement design to ensure that the design complied with the City's regulations. The City also argues that it should not be held liable for inverse condemnation "simply because it approved the developer's design for a drainage easement."[2] The Wilsons, on the other hand, contend that the intent element of the inverse condemnation claim was established when evidence was introduced showing that the City intentionally approved the plans submitted by the developers and intentionally chose to implement only part of its own Plan concerning drainage in the area of the Wilson property.

■ An early Texas Supreme Court case set the standard for intent determinations in inverse condemnation suits. In *Texas Highway Department v. Weber*, a landowner sued the state for "taking" his property after a fire set by workers maintaining a highway near his property destroyed a hay crop. 147 Tex. 628, 629–30, 219 S.W.2d 70, 70–71 (1949). The *Weber* court held that no taking for public use could be found when the damage occasioned by the fire was not *necessarily an incident to, or necessarily a consequential result of,* the actions of the employees in maintaining the highway. *Id.* Stated another way, since the *Weber* decision, damages resulting from mere negligence are not compensable in an inverse condemnation claim. *Id; see also City of Tyler v. Likes*, 962 S.W.2d 489, 505 (Tex.1997); *Steele*, 603 S.W.2d 786, 790; *Dalon v. City of DeSoto*, 852 S.W.2d 530, 538 (Tex.App.-Dallas 1992, writ denied); *City of Dallas v. Ludwick*, 620 S.W.2d 630, 632 (Tex.Civ.App.-Dallas 1981, writ ref'd n.r.e.).

■ Because an inverse condemnation claim may not be based on a governmental entity's negligent damaging of property, an inverse condemnation plaintiff must prove more than just negligence. An invasion onto one's land is considered intentional, rather than negligent, when the State acts for the purpose of causing the invasion or knows that it is substantially certain to result from its conduct. *See, e.g., City of Houston v. Renault*, 431 S.W.2d 322, 325 (Tex.1968); *Harris County Flood Control Dist. v. Adam*, 56 S.W.3d 665, 669–70 (Tex.App.-Houston [14th Dist.] 2001, no pet.); *City of Perryton v. Huston*, 454 S.W.2d 435, 437–38 (Tex.Civ.App.-Eastland 1970, writ ref'd n.r.e.); *Carter v. Lee*, 502 S.W.2d 925, 930 (Tex.Civ.App.-Beaumont 1973 writ ref'd n.r.e.).

---

**2.** Amici briefs were filed on this issue. The amici argue that the "trial court's judgment improperly equates the approval of private development plans with liability for a public project and affects not just Keller but all governmental entities." The evidence discussed herein, however, establishes that the City's liability is not based merely on its approval of the developer's plans.

The determination of whether a taking has occurred is a question of law. *City of Austin v. Travis County Landfill, Co.*, 73 S.W.3d 234, 241 (Tex.2002). Nonetheless, we depend on the fact finder to resolve disputed issue of fact regarding the extent of the governmental intrusion. *Id.* Here, during the charge conference, the Wilsons' attorney advised the trial court that whether a taking had occurred was a question of law for the trial court and explained, "I think before you get to the issue of intent and public purpose, there must be a judicial determination that there was a taking under inverse condemnation law." The City's counsel agreed. The City's posture throughout trial was that it was not responsible for any damage to the Wilson property because it did not intend to flood the property and was not substantially certain that flooding would result from its choice to forego building the easement across the Wilson property. Hence, in this case, whether the *extent* of the governmental intrusion rose to the level of a constitutional taking was not at issue. Instead, the focus was on whether or not the City acted intentionally or, at the most, only negligently. The City requested that this issue be submitted to the jury for resolution.

Thus, as requested by the City in its third and fourth issues, we review the sufficiency of the evidence to support the jury's fact finding that the City "intentionally performed acts which did result in a damaging of the Wilson property." Applying the above intent standard to the legal sufficiency challenge here, we review the entire record, considering only the evidence and inferences that tend to support the jury's intentional finding and disregarding all evidence and inferences to the contrary. The evidence established that in 1990 the City retained Knowlton–English–Flowers, Inc. to create a Master Drainage Plan for the area surrounding the Wilson property. A copy of this Plan was offered and admitted into evidence as defendant's exhibit number one. The City adopted the Plan in 1991. The Plan required the construction of an earthen drainage channel running from north to south along the western edge of the Sebastian property. The earthen channel was then to cut diagonally across the Wilson property, running from the northwest corner almost to the southeast corner of the Wilson property.

The Plan required the City to condemn approximately 2.8 acres of the Wilson property for construction of the earthen channel. It called for the earthen channel cutting across the Wilson property to be five feet deep and approximately forty-five feet wide. Near the southeastern corner of the Wilson property, the channel was to connect with a "box culvert" that would funnel water from the channel, under Wilson Lane, and into Little Bear Creek. *See* Appendices A, B.

The testimony presented at trial established that the City required the developers to purchase an easement on the City's behalf down the western edge of the Sebastian property and to construct the earthen channel on the Sebastian property in 1994. Then, in 1996 or 1997, the City built and completed the box culvert required by the Plan. Mr. Dresher, the City Manager, testified that the City knew the water from the Sebastian easement was going to flow across the Wilson property in order to exit Little Bear Creek. Thus, the Wilsons presented evidence showing that the City completed the upper portion of the Plan and the lower portion of the Plan, but left uncompleted the portion of the

Plan that provided for drainage across their property.[3]

Pictures offered into evidence at trial show water flowing down through the channel cut into the Sebastian property. At the edge of the Wilson property where the channel stops, the pictures show the previously-channeled water flowing uncontrolled over the Wilson property, flooding it. Johnny Wilson testified on cross-examination:

Q. You are critical of their [the City's] permitting and allowing the developers to build what they built above you and your drainageway. That's your criticism of the City, essentially; is that correct?

A. Well, yes. And I think that they should have—they went down below me in North Richland Hills and dug a channel from North Richland Hills Bear Creek up to my property line.

Q. Well, did that—

A. But they didn't—they didn't offer to go through where I live and where the Sebastians was. They bought the Sebastians out, or someone did, and moved in on the Sebastians, and then they dumped it all on me.

. . . .

Q. And you believe that the City should have not allowed that permitting or building by these two developers in those drainage areas?

A. Well, they should—it was all right to permit it if they had went ahead and carried out their drainage deal, but they didn't—they didn't follow through on all their drainage.

Dr. Spindler, the Wilsons' expert, likewise testified that his "major issue" with the easement is that the City "end an improved channel like that without adequate receiving channel." Dr. Spindler explained:

The—what I looked at, obviously, was the master plan. That's a major design. And the major design said that a channel goes through the Wilson property, goes all the way to the receiving Bear Creek. That is not what was constructed on the ground.

Dr. Spindler testified that he did a hydrological engineering study to determine any projected increase in the volume of water flowing across the Wilson property as a result of the development of the Estate of Oak Run and Rancho Serena and the Sebastian easement. Dr. Spindler's report concerning this study was introduced into evidence. The report shows, and Dr. Spindler testified, that the development of the Estates of Oak Run and Rancho Serena and the creation of the Sebastian easement would increase the volume and flow of water across the Wilson property from the rate of fifty-five cubic feet per second to ninety-three cubic feet per second.

John W. Wilson testified that he lost the use of approximately six acres of his land as a result of the water flowing from the channel on the Sebastian property. He testified that he lost a fence, top soil, and was unable to run cattle on his land anymore. John testified that he could not walk across his property anymore because of the water; it vacillated from depths of above his ankles to waist high.

Mr. Barnes, the Director of Public Works for the City, testified that the City has the authority to control the way land within the City is developed. The City had the right to tell the developers what was required in order for the City to ap-

---

**3.** The City's Director of Public Works conceded that, "[W]hat the City has at this point is part—the top part of the drainage plan, it has the bottom part of the drainage plan completed, but there's nothing—but there's not anything in between."

prove the developments and to impose any requirement the City deemed feasible and workable. Mr. Barnes explained that the City asked the developer of the Estates of Oak Run to obtain the permanent drainage easement from Ms. Sebastian to save the City the expense of paying for the easement. He agreed that the City required the developer of the Estates of Oak Run to bear the construction costs of the drainage channel on the Sebastian easement to save the City that expense. Mr. Barnes agreed that the City owned the easement and that it was for the benefit of "the City of Keller and its citizens."

Mr. Barnes testified that the City was bound by the Master Drainage Plan and that there were "no exceptions" to it.[4] Hence, the City required that the designs for the detention basin and the permanent easement comply with its Master Drainage Plan. The City approved the designs submitted by the developers as complying with the Plan. The City supervised the construction of the detention basin and the easement. The City inspected the basin and easement as they were being built by the developer. Mr. Barnes agreed that prior to the development of the subdivisions, the land on which they are located was mostly wooded. Mr. Barnes testified that the removal of trees and vegetation from land causes water on the land to run faster and decreases the ground's absorption of water. He testified that the trees and vegetation were removed from the Sebastian easement for construction of the earthen channel so that the water would flow more smoothly.

 Intent may be inferred from the circumstances of the case and the conduct of the actor, not just from overt expressions of intent by the actor. *Behringer v. Behringer*, 884 S.W.2d 839, 842 (Tex. App.-Fort Worth 1994, writ denied). Because defendants will rarely admit knowing to a substantial certainty that given results would follow from their actions, triers of fact are free to discredit defendants' protestations that no harm was intended and to draw inferences necessary to establish intent. *See Twyman v.Twyman*, 855 S.W.2d 619, 624 (Tex.1993).

The City's own Plan required it to condemn and to build an earthen drainage channel across the Wilson property. The City knew that the water flowing from the Sebastian easement would necessarily flow across the Wilson property. The City knew that the removal of trees and vegetation from the developments and the earthen channel on the Sebastian easement would cause the water on the land to run faster and would decrease the ground absorption of the water. The City controlled the drainage within the City and had the right to impose any requirements feasible and workable on the developers concerning drainage from the developments. Yet, although knowing that the water upstream would be absorbed less and would flow faster through the Sebastian easement, the City chose not to implement or require construction of the Plan's easement across the Wilson property.

The City did not explain why the Plan, adopted in 1991, required an easement and drainage channel across the Wilson property if, as the City contended at trial in

---

4. Specifically, Mr. Barnes testified:

Q. Okay. So the City was going to—would require Mr. Wilson to give up approximately 2.8 acres of his land to comply with the master drainage plan; is that correct?

A. [by Mr. Barnes]: Approximately, yes, sir.

Q. Okay. And is it the City's policy to follow the master drainage plan?

A. Yes, sir.

Q. And, to the best of your knowledge, are there any exceptions to this policy?

A. No, sir.

1999, the completion of only the upper portion of the Plan—the detention basin and Sebastian easement—would not cause increased water flow across the Wilson property. Thus, the jury could have reasonably inferred that the Plan required such an easement because, as John Wilson and Dr. Spindler testified, it was necessary to prevent flooding on the Wilson property. That is, the jury could have questioned why the easement across the Wilson property was included in the Plan at all if such an easement was not necessary to prevent an increase in the volume and speed of downstream water across the Wilson property. Additionally, the jury could have concluded that Mr. Barnes's admission that the City knew the upstream water would be absorbed less and would flow faster due to the removal of trees and vegetation from the developments and from the forty-five-foot-wide earthen channel on the Sebastian easement meant that the City knew with absolute certainty that when the water reached the edge of the Wilson property it would have a significantly increased volume and flow speed, and thus knew with substantial certainty that the increase in volume and velocity of water funneled onto the unimproved ditch on the Wilson property would result in flooding of the Wilson property.

Moreover, the jury could have believed Dr. Spindler and his hydrological engineering study demonstrating the certainty of an almost doubling in water volume and speed across the Wilson property because of the proposed subdivisions and the Sebastian easement. The City did not conduct such a study and, as pointed out above, provided no rationale for its bald conclusion that the Plan's requirement for an easement across the Wilson property was unnecessary or in error.

From the evidence presented, the jury could have reasonably concluded that the City intentionally disregarded its own Plan's requirement that an easement and large earthen drainage channel be created across the Wilson property and that the City knew flooding of the Wilson property was substantially certain to result from its decision to leave the portion of its Plan concerning the Wilson property uncompleted. Essentially, the jury could have reasoned that, when the City decided to construct a forty-five-foot-wide drainage channel on the Sebastian property, to almost double the volume and flow of water through that channel, to have the channel stop at the edge of the Wilson property, and to make no provisions on the Wilson property for the previously-confined water,[5] the City either intended to take or damage, i.e., inversely condemn, the Wilson property or was aware that a taking or damaging was substantially certain to result. Moreover, the jury could have reasonably concluded based on the evidence introduced before them that the Wilson easement was included in the Plan to ensure proper drainage, i.e., that the Wilson property was not flooded, that the City intentionally altered the Plan knowing that the flooding of the Wilson property was substantially certain to result from its decision, and that the City nonetheless chose not to build the Wilson easement simply to avoid compensating the Wilsons for the condemnation of approximately 2.8 acres of their property. We hold that viewing all of this evidence and the reasonable inferences from this evidence in the light most favorable to the jury's verdict and disregarding all contrary evidence and in-

5. The box culvert at the edge of the Wilson property was constructed *after* the drainage channel was built, and, according to the Wil-

sons' evidence, did not then address their flooding problems.

ferences more than a scintilla of evidence exists to support the jury's finding that the City acted intentionally. *See Cazarez*, 937 S.W.2d at 450.

■ We next address the City's contention that the evidence is factually insufficient to support the jury's finding that the City acted intentionally. *See Glover*, 619 S.W.2d at 401. An assertion that the evidence is factually insufficient to support a finding means that the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the jury's answer should be set aside and a new trial ordered. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965). We consider all of the evidence in the case in determining a factual sufficiency point. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex.), *cert. denied*, 525 U.S. 1017, 119 S.Ct. 541, 142 L.Ed.2d 450 (1998).

The evidence supporting the finding is outlined above. The record also contains evidence that tends to contradict the jury's finding that the City acted intentionally. The civil engineer who designed the easement for Bursey and Texas Rover testified that his plans were drawn up in accordance with standard design criteria and with the City's requirement that construction would not result in an increase in the flow or velocity of water to downstream property. Mr. Barnes testified that an engineer in his office reviewed the plans for both subdivisions and determined that their proposed drainage systems complied with City's drainage requirements. A civil engineer from the engineering firm that drew up the City's Master Drainage Plan performed a review of the drainage plans submitted by the developers and concluded that the subdivisions and implementation of the developers' drainage plans would not result in an increase in the flood water runoff onto downhill properties. Mr. Dresher testified that the City "would not

have approved the developments unless we were assured that the developments did not increase the velocity of water or the flow of water" onto others' property.

We cannot hold that the evidence supporting the jury's finding that the City acted intentionally is so weak or that the above recited evidence to the contrary is so overwhelming that the jury's answer should be set aside and a new trial ordered. *See Garza*, 395 S.W.2d at 823. Nor can we hold, as the City urges, that the Wilsons presented evidence of only negligence. *See, e.g., Dalon*, 852 S.W.2d at 538 (holding mere negligence in approving upstream development not actionable). The evidence outlined above is factually sufficient to support the jury's finding that the City made an intentional choice to not comply or require the developers to comply with the Plan's drainage easement across the Wilson property and that the City knew flooding of the Wilson property was substantially certain to result from its decision. We overrule the City's third and fourth issues.

### 3. Municipalities as Insurers.

In its fifth issue, the City argues that it cannot be held liable for inverse condemnation when damage to property is the result of its enforcement of drainage and development regulations on another property. The City argues that permitting a municipality to be liable for inverse condemnation when its only link to the property damaged is through the enforcement of regulations on a third party, makes municipalities guarantors against the negligence of developers and their engineers. It contends that it was merely approving the subdivision plats and enforcing drainage regulations and is not liable for such actions under *City of Round Rock v. Smith*, 687 S.W.2d 300, 303 (Tex.1985), *Phillips v. King County*, 136 Wash.2d 946, 968 P.2d 871 (1998), and *Bargmann v.*

*State of Nebraska,* 257 Neb. 766, 600 N.W.2d 797 (1999). These cases do not support the proposition that the City is not liable here.

In *City of Round Rock,* the supreme court held that municipalities exercise a governmental function, specifically a quasi-judicial exercise of their police power, when they approve subdivision plats and that the Tort Claims Act therefore provides for no waiver of immunity when they *negligently* approve such plats. 687 S.W.2d at 303. The supreme court rejected the plaintiffs inverse condemnation claim because their predecessor in title consented to the "taking" at the time it occurred, thus extinguishing the plaintiff's constitutional inverse condemnation action. *Id.* In *Bargmann,* the municipality was not liable under an inverse condemnation theory for flooding on the plaintiff's property, specifically because "the City was not involved in the construction, development, or maintenance" of the subdivision that caused the flooding. 600 N.W.2d at 805.

In *Phillips,* the Washington Supreme Court recognized that the plaintiffs did possess an inverse condemnation claim under facts similar to the present facts. King County approved a development plat conditioned on subsequent approval of a surface water drainage plan. 968 P.2d at 873. The County approved the drainage plans as being in compliance with the County's codes and regulations, and the developer constructed the development and the drainage plan. *Id.* When the development and drainage construction caused flooding on the Phillips' property, they sued the County for inverse condemnation. *Id.* at 875. In upholding denial of summary judgment for the County, the supreme court explained:

> Rather than acting only to approve plans, the County here used its own property for the specific placement of drainage devices allegedly intended to drain water onto the Phillips' property. . . . This alleged conduct, of allowing the use of public land to convey the subdivisions' storm water to the edge of, and then upon, the Phillips' property, satisfies the public use element of an inverse condemnation cause of action. . . . The County's action here was not simply approval and permitting—it was actual involvement in the drainage project.

*Id.* at 881–82.

Similarly, as outlined above, the evidence establishes that the City's liability for inverse condemnation in this case is based not on any flaw in the developer's design or construction of the detention basin or Sebastian easement, but instead on the City's own intentional choice to leave uncompleted the portion of its Plan addressing drainage across the Wilson property. Thus, the City here is not being held liable for its enforcement of regulations on a third party, nor being held liable as a guarantor for the negligence of developers and their engineers.

 The City also argues under its fifth issue that it should not be liable for inverse condemnation because the injury to the Wilson property did not result from any "public use" as required under Texas Constitution article 1, section 17. A "public use" is one that concerns the whole community in which it exists, as contradistinguished from a particular individual or number of individuals. *Leathers v. Craig,* 228 S.W. 995, 998 (Tex.Civ.App.-Galveston 1921, no writ); *see also Felts v. Harris County,* 915 S.W.2d 482, 484–86 (Tex.1996) (contrasting compensable damages from public works with uncompensable damages suffered by the community as a whole); *City of Arlington v. Golddust Twins Realty, Inc.,* 41 F.3d 960, 965–66 (5th Cir.1994) (recognizing one of the tests for "public

use" as being whether the property taken is " 'reasonably essential' to successful completion of a project").

The Plan required the City to condemn approximately 2.8 acres of the Wilson property and create an earthen drainage channel to route the water flowing through the Sebastian easement across the Wilson property. Clearly, had the City used its powers of eminent domain to condemn a portion of the Wilson property for an easement, that use would have been a "public use" to implement the City's Master Drainage Plan. The fact that the City chose not to condemn any of the Wilson property and to instead, in violation of the Plan, allow the water flowing from the Sebastian easement to discharge, uncontrolled, across the Wilson property shows that the invasion of the Wilson property by the water flowing from the Sebastian easement was for "public use." Mr. Barnes testified that the detention basin and the Sebastian easement were built "for the benefit of the City of Keller and its citizens," i.e., the community as a whole. Mr. Dresher testified that the developments performed a public good for the citizens of the City, i.e., the community as a whole. And there is no question condemnation of the easement across the Wilson property was "reasonably essential" to the successful completion of the Master Drainage Plan. Thus, we cannot agree that the City's "taking" of a portion of the Wilson property was not for public use. We overrule the City's fifth issue.

### 4. Admission of Lawyer Letter.

■ In its sixth issue, the City claims that the trial court erred by admitting into evidence a letter written by Ms. Sebastian's attorney to the City in connection with the purchase of the easement across her land. The City contends that the letter consists entirely of inadmissible conclusions and opinions from an unqualified fact witness. The heavily redacted letter contains a single relevant paragraph:

4. The Wilsons are not obligated to take the proposed diversion and increase in the natural flow of surface water. The Wilsons are entitled legally either to dam their property against this water or to sue the Sebastians for damages for diversion of surface water. There is no solution or compensation proposed for this problem.

According to the City, this letter and the testimony of the attorney who wrote it constitute the *only evidence* on the intent element of the Wilsons' inverse condemnation claim, i.e., that the City was substantially certain that damage to the Wilson property would result from their approval of the developments and construction of the Sebastian drainage easement. The City concludes, therefore, that the letter's improper admission was necessarily harmful and that the judgment must be reversed.

■ To obtain reversal of a judgment based upon an error in the trial court, the appellant must show: (1) there was, in fact, error; and (2) the error probably caused rendition of an improper judgment in the case. TEX.R.APP. P. 44.1(a); *In re D.I.B.*, 988 S.W.2d 753, 756 n. 10 (Tex.1999); *Tex. Dep't of Human Servs. v. White*, 817 S.W.2d 62, 63 (Tex.1991). We will not reverse a trial court's judgment based on an erroneous evidentiary ruling unless the ruling probably caused the rendition of an improper judgment. *Owens–Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex.1998) (applying TEX. R.APP. P. 44.1). The complaining party must show the whole case turned on the evidence at issue. *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753–54 (Tex. 1995). We examine the entire record in making this determination. *Jamail v. Anchor Mortgage Servs., Inc.*, 809 S.W.2d

221, 223 (Tex.1991). Error in admitting evidence is generally harmless if the contested evidence is merely cumulative of properly admitted evidence. *Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 230 (Tex.1990).

We have held that the evidence the City intended to damage the Wilson property or knew that damage was substantially certain to result from its approval of the developments and its decision to only partially implement its Plan is legally and factually sufficient to support the jury's finding that the City acted intentionally. Thus, we need not determine whether the attorney letter was improperly admitted. In other words, despite the City's characterization of the attorney's letter as the only evidence on the issue of intent, we have held that other legally and factually sufficient evidence exists on the issue of the City's intent. Therefore, we cannot hold that the letter's admission, even if improper, probably caused the rendition of an improper judgment. The City's sixth issue is overruled.

## B. The City's Appellate Issues Regarding The Water Code.

■ In its seventh issue, the City challenges the legal and factual sufficiency of the evidence to support the jury's finding that the City "diverted the natural flow of surface water in a manner that damaged" the Wilson property. The Wilsons elected to recover under their inverse condemnation theory rather than under the water code violations theory. We have determined that the evidence is legally and factually sufficient to support the jury's findings and the trial court's judgment on the inverse condemnation theory. Accordingly, we decline to address the City's seventh

issue challenging the legal and factual sufficiency of the evidence to support the alternative water code violations theory of recovery.

## VI. THE WILSONS' APPEAL.

The Wilsons pleaded trespass and water code violations against Bursey, Texas Rover, and Tri–West.[6] Bursey and Texas Rover filed a joint traditional and no-evidence motion for summary judgment as to both the Wilsons' theories of recovery. Tri–West filed a traditional motion for summary judgment challenging both of the Wilsons' claims against it. Ultimately, the trial court granted summary judgments for Bursey, Texas Rover, and Tri–West on the Wilsons' trespass and water code violations theories of recovery. The Wilsons challenge these summary judgments.

## A. Standards of Review.

### 1. No–Evidence Summary Judgment.

After an adequate time for discovery, the party without the burden of proof may, without presenting evidence, move for summary judgment on the ground that there is no evidence to support an essential element of the nonmovant's claim or defense. TEX.R. CIV. P. 166a(i). The motion must specifically state the elements for which there is no evidence. *Id.* The trial court must grant the motion unless the nonmovant produces summary judgment evidence that raises a genuine issue of material fact. *See* TEX.R. CIV. P. 166a(i) cmt.; *Moore v. K Mart Corp.*, 981 S.W.2d 266, 269 (Tex.App.-San Antonio 1998, pet. denied); *Jackson v. Fiesta Mart, Inc.*, 979 S.W.2d 68, 71 (Tex.App.-Austin 1998, no pet.).

---

**6.** Bursey, Texas Rover, and Tri–West are sometimes collectively referred to herein as

"the developers."

A no-evidence summary judgment is essentially a pretrial directed verdict, and we apply the same legal sufficiency standard in reviewing a no-evidence summary judgment as we apply in reviewing a directed verdict. *Frazier v. Yu,* 987 S.W.2d 607, 610 (Tex.App.-Fort Worth 1999, pet. denied); *Moore,* 981 S.W.2d at 269. We review the evidence in the light most favorable to the party against whom the no-evidence summary judgment was rendered, disregarding all contrary evidence and inferences. *Szczepanik v. First S. Trust Co.,* 883 S.W.2d 648, 649 (Tex.1994). If the nonmovant brings forward more than a scintilla of probative evidence that raises a genuine issue of material fact, then a no-evidence summary judgment is not proper. *Moore,* 981 S.W.2d at 269.

## 2. Traditional Summary Judgment.

In a traditional summary judgment case, the issue on appeal is whether the movant met his summary judgment burden by establishing that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Tex.R. Civ. P. 166a(c); *KPMG Peat Marwick v. Harrison County Hous. Fin. Corp.,* 988 S.W.2d 746, 748 (Tex.1999); *City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678 (Tex.1979). The burden of proof is on the movant, and all doubts about the existence of a genuine issue of material fact are resolved against the movant. *Rhone–Poulenc, Inc. v. Steel,* 997 S.W.2d 217, 223 (Tex.1999); *Friendswood Dev. Co. v. McDade + Co.,* 926 S.W.2d 280, 282 (Tex.1996); *Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co.,* 391 S.W.2d 41, 47 (Tex.1965). Therefore, we must view the evidence and its reasonable inferences in the light most favorable to the nonmovant. *Great Am.,* 391 S.W.2d at 47.

In deciding whether there is a material fact issue precluding summary judgment, all conflicts in the evidence are disregarded and the evidence favorable to the nonmovant is accepted as true. *Rhone–Poulenc,* 997 S.W.2d at 223; *Harwell v. State Farm Mut. Auto. Ins. Co.,* 896 S.W.2d 170, 173 (Tex.1995). Evidence that favors the movant's position will not be considered unless it is uncontroverted. *Great Am.,* 391 S.W.2d at 47.

A defendant is entitled to summary judgment if the summary judgment evidence establishes, as a matter of law, that at least one element of a plaintiff's cause of action cannot be established. *Elliott–Williams Co. v. Diaz,* 9 S.W.3d 801, 803 (Tex.1999). To accomplish this, the defendant-movant must present summary judgment evidence that negates an element of the plaintiff's claim. Once this evidence is presented, the burden shifts to the plaintiff to put on competent controverting evidence that proves the existence of a genuine issue of material fact with regard to the element challenged by the defendant. *Centeq Realty, Inc. v. Siegler,* 899 S.W.2d 195, 197 (Tex.1995).

## B. Bursey and Texas Rover's Motion for Summary Judgment and Wilsons' Response.

The Wilsons argue in their first and second issues that the trial court erred in granting Bursey and Texas Rover's motion for summary judgment on their trespass and water code claims. Bursey and Texas Rover's traditional summary judgment motion asserted that the summary judgment evidence conclusively established they lacked the requisite intent to trespass and that the City, not the developers, caused the water to enter the Wilson property.

In response to the Bursey and Texas Rover motion for summary judgment, the Wilsons produced summary judgment evidence that Bursey developed Oak Run, that Oak Run drained water into the City's

easement on the Sebastian property, and that Texas Rover was a general partner of Bursey. The Wilsons also produced evidence that their expert inspected the Oak Run property and surrounding area; reviewed the designs and plans for the development; reviewed the predevelopment topography for the area; and constructed hydrological models, based on his observations and other scientific data, showing that the development of Oak Run resulted in an increase in the amount of water channeled onto the Wilson property.

### C. Tri–West Motion for Summary Judgment and Wilsons' Response.

In their third issue, the Wilsons argue that the trial court erred in granting Tri–West's motion for summary judgment on their trespass and water code claims. Tri–West moved for summary judgment on the Wilsons' trespass claim by arguing that the evidence did not show Tri–West intentionally diverted surface water or that the excess drainage violated a property right of the Wilsons. Tri–West moved for summary judgment on the Wilsons' water code claim by arguing that the *City* possessed the exclusive right to control drainage within the City limits so that Tri–West could do "nothing more than comply with the drainage requirements of the City," which it did.

In response, the Wilsons asserted that Tri–West's compliance with city ordinances did not relieve it of liability under the water code. The Wilsons also pointed out that Tri–West's arguments mirrored those it urged in a prior summary judgment motion that the trial court had denied. The Wilsons adopted the arguments set forth in their response to that first motion, where they contended that construction of the subdivision resulted in a sixty-nine percent increase in the water diverted to their property, and that to be liable for

trespass Tri–West needed only to intend to develop Rancho Serena, not to intend the increase in water flow. The Wilsons also argued that Tri–West misinterpreted section 11.086 of the water code by suggesting that the creation of an easement frees a developer of liability. Finally, to raise a fact issue on damages, the Wilsons quoted an affidavit of John W. Wilson in which he stated that the increase in water flow on his property had knocked over a fence, created additional ditches, and rendered the land unusable for farming or livestock.

### D. Water Code Causes of Action.

Pursuant to Texas Water Code section 11.086, a property owner can recover for damages to her property attributable to the diversion or impoundment of surface waters by another. TEX. WATER CODE ANN. § 11.086(a), (b) (Vernon 2000). The elements of the statutory cause of action are (1) a diversion or impoundment of surface water (2) that causes (3) damage to the property of the plaintiff landowner. *Kraft v. Langford*, 565 S.W.2d 223, 229 (Tex.1978). Surface water is that which is diffused over the ground from falling rains or melting snows, and it continues to be such until it reaches some bed or channel in which such water is accustomed to flow. *Stoner v. City of Dallas*, 392 S.W.2d 910, 912 (Tex.Civ.App.-Dallas 1965, writ ref'd n.r.e.).

As outlined above, Bursey, Texas Rover, and Tri–West sought summary judgment on the Wilsons' water code violations on the grounds that the City possessed the exclusive right to control the drainage from the developments. Because the City required and approved the developer's design of the Sebastian drainage easement in accordance with its Plan, movants argued that the City, not the developers, bore responsibility for the diversion of the water. Bursey, Texas Rover, and Tri–West argued that they simply followed the City's directives and were therefore not

liable under *Carter v. Lee*, 502 S.W.2d 925, 930 (Tex.Civ.App.-Beaumont 1973, writ ref'd n.r.e.) (holding that "[t]he law in this state has been settled long ago that a municipality has the exclusive right to control the drainage of surface water within its city limits, but, in exercising that right, it is incumbent upon the city to use ordinary care to avoid injuring the property of its citizens.")

The summary judgment evidence shows that developments in the City are required to conform to the City's drainage requirements. In order for the City to approve the Rancho Serena and Estates of Oak Run development plans, the City required the developers to obtain an easement from Ms. Sebastian for the construction of a five foot deep, forty-five-foot-wide earthen channel. The developers hired engineers to draw up plans for the drainage easement. The developers submitted those plans to the City, and the Director of Public Works for the City indicated in his deposition, attached to the summary judgment motions as summary judgment evidence, that he "made sure that the plans that the engineer submitted met our drainage criteria." The City now owns and maintains the drainage easement across the Sebastian property.

The City could have imposed the same requirement on the developers with regard to the Plan's projection of an easement across the Wilson property, but chose not to. The City also could have decided to condemn an easement across the Wilson property and construct its own drainage channel. The City could own and maintain a drainage easement across the Wilson property. Despite the Plan, the City chose not to address the drainage across the Wilson property at all. The developers, on the other hand, possessed no authority to seek an easement across the Wilson property when it was not requested by the City.

We hold that the City's right to control the drainage of surface water, compounded by its direct involvement in the water drainage of the Estates of Oak Run and Rancho Serena developments as well as its decision to leave the Plan across the Wilson property uncompleted severed any causal relationship between the developers' diversion of surface water and the damage to the Wilson property. *See Benavides v. Gonzalez*, 396 S.W.2d 512, 514 (Tex.Civ. App.-San Antonio 1965, no writ) (holding summary judgment proper because evidence of unprecedented rain conclusively established rain as the cause of the overflow of the diverted or impounded surface waters, not the unlawful act of the defendant). No unlawful act or omission by Bursey, Texas Rover, or Tri–West *caused* the flooding of the Wilson property. These defendants, having conclusively negated the causation element in the Wilsons' water code claim, shifted the burden to the Wilsons to come forward with controverting summary judgment evidence raising a genuine issue of material fact on causation. *See Siegler*, 899 S.W.2d at 197.

The Wilsons did not produce any competent controverting evidence in their response to Bursey and Texas Rover's summary judgment motion. The Wilsons merely asserted that the construction of the Estates of Oak Run had resulted in a thirty-nine percent increase in the amount of water directed across their property. The Wilsons then argued: "The Plaintiff's evidence clearly show that BURSEY LIMITED, has diverted the natural flow of surface water and has impounded the natural flow of surface water, that such action has caused increased water upon the Plaintiff's property and that TEXAS ROVER is liable for the action of BURSEY RESIDENTIAL LIMITED." These state-

ments do not raise a genuine issue of material fact as to causation because they do not point to any evidence tending to dispute the premise that the City's involvement serves as an intervening or superceding cause of damage. Therefore, the trial court correctly granted summary judgment for Bursey and Texas Rover on the Wilsons' water code claim.

The Wilsons' response to Tri–West's summary judgment motion was more in depth. There, the Wilsons argued that a developer's compliance with city requirements is not a valid defense to a water code violation, citing *Bily v. Omni Equities Inc.*, 731 S.W.2d 606, 610–11 (Tex. App.-Houston [14th Dist.] 1987, writ ref'd n.r.e.). The Wilsons also argued that Tri–West's case law indicating a city has the exclusive right to control surface water within the city limits is not good law, citing *City of San Antonio v. Carter*, 511 S.W.2d 262, 263 (Tex.1974). We will discuss the Wilsons' arguments in turn.

The Houston Fourteenth Court in *Bily* simply held that compliance with a municipal ordinance does not automatically excuse a concurrent water code violation. 731 S.W.2d at 611. Tri–West does not contend otherwise. Tri–West asserts, as discussed above, that the City's right to control the drainage of surface water, as well as the City's actions concerning the Sebastian easement and inaction concerning the Plan's easement requirement for the Wilson property, created a break in any causal connection between Tri–West's diversion of surface water and the damage to the Wilson property. Thus, we do not find *Bily* controlling.

Likewise, we are not persuaded that *Carter v. Lee*, recognizing that a city has the exclusive right to control surface water within the city limits is not good law. 502 S.W.2d 925, 930 (Tex.Civ.App.-Beaumont 1973, writ ref'd n.r.e.). In support of this contention, the Wilsons cite *City of San Antonio*, 511 S.W.2d at 263, the per curiam writ refusal following *Carter v. Lee*. *City of San Antonio* provides, in its entirety:

This is a suit by adjoining landowners against developers and the City of San Antonio for diversion of the natural flow of water onto the plaintiffs' land. The trial court entered a take nothing judgment, and the Court of Civil Appeals reversed and remanded. 502 S.W.2d 925. Only the City of San Antonio applied for writ of error. It is refused, no reversible error. Our action is not to be interpreted as approving the majority opinion of the Court of Civil Appeals as to any liability of the City which is based solely upon a reasonable exercise of the police power in approving the subdivision plans under Article 974a, Vernon's Ann. Civ. St. *See City of Wichita Falls v. Mauldin*, 39 S.W.2d 859 (Tex. Com. App.1931, judgment adopted).

511 S.W.2d at 263. Tri–West did not argue that the City's approval of Rancho Serena alone mandated the City's liability in this case. Rather, Tri–West argued:

The City of Keller has the sole and exclusive right to control the easement, the channel constructed thereon and the water flowing through same.... Because the exclusive right to control drainage within its city limits rests exclusively with the City of Keller, Tri–West could do nothing more than comply with the drainage requirements of the City.

Thus, the supreme court's pronouncement in *City of San Antonio* is not applicable to the present case. Tri–West's arguments in support of its motion for summary judgment on the Wilsons' water code violations do not rest on the City's approval of its development plans, but rather focus on the City's sole right to control drainage within the City and its

active participation in and control of the drainage process here.

Although the Wilsons' response to Tri–West's motion for summary judgment raised the two legal arguments we have addressed, it did not point to controverting summary judgment evidence raising a genuine issue of material fact concerning whether the City's involvement served as an intervening or superceding cause of damages under the water code. Therefore, the trial court correctly granted summary judgment for Tri–West on the Wilsons' water code claim.

### E. Trespass Causes of Action.

■ A trespass to real property is committed where a person enters another's land without consent. *Ward v. N.E. Tex. Farmers Co-op Elevator*, 909 S.W.2d 143, 150 (Tex.App.-Texarkana 1995, writ denied). The entry need not be made in person but may be made by causing or permitting a thing to cross the boundary of a property. *Gregg v. Delhi–Taylor Oil Corp.*, 162 Tex. 26, 344 S.W.2d 411, 416 (1961); *Glade v. Dietert*, 156 Tex. 382, 295 S.W.2d 642, 645 (1956); *City of Arlington v. City of Fort Worth*, 873 S.W.2d 765, 769 (Tex.App.-Fort Worth 1994, writ dism'd w.o.j.). A trespass is usually regarded as an intentional tort in the sense that it involves an intent to commit an act that violates a property right, or would be practically certain to have that effect, although the actor may not know that the act he intends to commit is such a violation. *Gen. Tel. Co. v. Bi–Co Pavers, Inc.*, 514 S.W.2d 168, 170 (Tex.Civ.App.-Dallas 1974, no writ); *First City Nat'l Bank v. Japhet*, 390 S.W.2d 70, 74 (Tex.Civ.App.-Houston 1965, writ dism'd).

As discussed above, the summary judgment motions of Bursey, Texas Rover, and Tri–West challenged the intent element of the Wilsons' trespass claims. The Wilsons' controverting summary judgment evidence, the report and deposition testimony of their expert, focused on the effect of the Rancho Serena and Estate of Oak Run developments on the Wilson property and on design problems with the developments and the drainage channel on the Sebastian property. The Wilsons argue that the developers' intent to develop the subdivisions together with the causal connection between such developments and the damage to the Wilson property satisfies the intent requirement for a trespass claim. The Wilsons rely upon *Bi–Co Pavers* to support this position. *See* 514 S.W.2d at 170.

In that case, a telephone company sought to hold a city paving contractor who had severed a telephone cable buried in a conduit under a public street liable under a theory of trespass. *Id.* at 169. The plaintiffs there also argued that the intent to perform an act combined with evidence of damage to another's property that directly resulted from the intentional act establishes a trespass. *Id.* at 170. The court in *Bi–Co Pavers* held that the intent to commit trespass required the intent to commit an act that violates a property right. *Id.* Consequently, no trespass had occurred in *Bi–Co Pavers* because no evidence existed that the contractor intended to operate the equipment at the depth where the cable was severed. *Id.* at 171. We find the reasoning in *Bi–Co Pavers* persuasive, and hold that Bursey, Texas Rover, and Tri–West cannot be held liable for trespass merely because they acted intentionally in constructing the subdivision and damage to the Wilson property followed.

The developers also argue that the record is devoid of evidence that shows they intended to trespass. We agree. The fact that the developers intended to build subdivisions and intended to build the easement required by the City does not

establish that they committed an act that violates a property right. *See id.* at 170. The distinction between our holdings that no evidence exists that the developers intended to commit an act violating a property right while evidence does exist that the City did intentionally take or damage the Wilson property is the fact that the City, while knowing that flooding of the Wilson property was substantially certain to result unless it built the Plan's drainage easement across the Wilson property, nonetheless chose to comply with only part of its Plan, intentionally choosing not to complete the portion of the Plan running across the Wilson property. From this choice by the City, the jury could have determined that the City intentionally inversely condemned a portion of the Wilson property to avoid compensating them for the easement required by the Plan. The same cannot be said of the developers. They simply built the Sebastian easement as directed by the City and made no choice that would raise a genuine issue of material fact as to whether they built the easement in violation of the Wilsons' property rights. We hold that the trial court properly granted summary judgment for Bursey, Texas Rover, and Tri–West on the Wilsons' trespass claims; we overrule the Wilsons' first, second, and third issues.

## VII. Conclusion.

Having held that the trial court did not err in entering judgment in favor of the Wilsons on their inverse condemnation claim against the City and that the summary judgments for the developers were correctly granted, we affirm the trial court's judgments in all respects.

CAYCE, C.J. filed a dissenting opinion.

# APPENDIX A

## APPENDIX B

JOHN CAYCE, Chief Justice, dissenting.

I respectfully dissent because there is no evidence to support the jury's finding that the City of Keller ("City") acted with intent to inversely condemn the Wilsons' property.

To establish a claim for inverse condemnation, a plaintiff must plead and prove that: (1) the governmental entity intentionally performed certain acts; (2) that resulted in a taking of property; (3) for public use.[1] Under Texas law, a "taking" for inverse condemnation purposes is defined as physical appropriation or invasion of property, or unreasonable interference with a landowner's right to use and enjoy the property.[2] *It is not enough that the governmental entity know or should know*

---

1. *Gen. Servs. Comm'n v. Little–Tex. Insulation Co.*, 39 S.W.3d 591, 598 (Tex.2001); *Bennett v. Tarrant County Water Control Imp. Dist. No. One*, 894 S.W.2d 441, 448 (Tex.App.-Fort Worth 1995, writ denied).

2. *See Westgate, Ltd. v. State*, 843 S.W.2d 448, 452 (Tex.1992).

*that its conduct involves a serious risk or likelihood of causing a taking; it must either act for the purpose of causing the taking or know that a taking is substantially certain to result from its conduct.[3]*

According to the majority, the jury could infer that the City knew that flooding of the Wilsons' property was substantially certain to result from the decision not to build an easement on the Wilsons' property, based on evidence showing that the City knew that development of the property upstream from the Wilsons' property would cause water to be absorbed less and flow faster through the developed property. At best, however, this evidence merely supports an inference that the City knew that the absence of the easement would create a serious risk or likelihood that water flowing downstream from the developed property would flood the Wilsons' property; it does *not,* as it must under the controlling law cited by the majority, support an inference that the City knew that flooding was substantially certain to result from its decision not to build the easement.[4]

I would, therefore, reverse the judgment for inverse condemnation and render judgment that the Wilsons take nothing on their inverse condemnation claim.

---

**3.** *Ford Motor Co. v. Dallas Power & Light,* 499 F.2d 400, 409 n. 16 (5th Cir.1974); *Houston v. Renault,* 431 S.W.2d 322, 325 (Tex.1968); *see also* RESTATEMENT (SECOND) OF TORTS § 8A (1965).

**4.** *See Ford Motor Co.,* 499 F.2d at 409 n. 16; *Houston,* 431 S.W.2d at 325; *see also* RESTATEMENT (SECOND) OF TORTS § 8A.